## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

US INVESTIGATIONS SERVICES, LLC,    )
    )
            Plaintiff,    )
    )
    v.    )    2:11-cv-0355
    )
SUSAN CALLIHAN AND SARAH LEEANN    )
BAUCOM,    )
    )
            Defendants.    )

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court is the MOTION FOR PARTIAL SUMMARY JUDGMENT filed by Plaintiff, US Investigations Services, LLC (Document No. 70).  The motion has been thoroughly briefed by all parties (Document Nos. 71, 88, 90, 91,  93, 95, and 97).  The parties have fully stated their respective positions regarding the Concise Statement of Material Facts and have submitted numerous exhibits (Document Nos. 72, 74, 77,78, 78,  89, and 92).  The motion is ripe for disposition.

### PROCEDURAL BACKGROUND

The genesis of this lawsuit is the voluntary termination from employment of two trusted US Investigations Services, LLC ("USIS") employees, Susan Callihan ("Callihan") and Sarah LeeAnn Baucom ("Baucom"), who both immediately went to work for two direct competitors of USIS --  Jupiter Corporation ("Jupiter") and KeyPoint Government Solutions, Inc. ("KeyPoint"). Upon Callihan and Baucom terminating their employment, USIS discovered that Callihan and Baucom both had allegedly "caused sensitive, proprietary and restricted information and proposal information of USIS to be purloined from USIS' computers and services and, on information and belief, to be disclosed and possibly used by direct competitors of USIS. . . ."

1

Amended Complaint at 2.  On March 18, 2011, USIS filed an eight-count Complaint in this Court against Callihan, Baucom, and another ex-USIS employee, Sharon Vernick.[1]  On March 29, 2011, USIS filed its First Amended Complaint in which it dismissed Sharon Vernick as a defendant and all claims against her.

USIS has filed the instant motion in which it seeks summary judgment only as to Count I - breach of contract against Callihan; Count II - breach of contract against Baucom; and Count V - breach of fiduciary duty against both defendants.   USIS is moving for summary judgment only as to Defendants' liability, as the exact amount of damages suffered by USIS remains to be calculated.  *See* Pl's Br. at 45, n. 17.

## Factual Background

USIS performs security and investigatory work for a number of clients, one of which is the United States Office of Personnel Management ("OPM").  On behalf of OPM, USIS conducts highly confidential employee background checks, record investigations, and security reviews of applicants seeking employment with the United States government.  USIS performs this investigatory work pursuant to various contracts between USIS and OPM, each of which is competitively bid pursuant to federally mandated procurement procedures.

Callihan was employed by USIS from October 4, 1999 to January 21, 2011 and Baucom was employed by USIS from September 15, 2003 to January 24, 2011.  Callihan was a team leader in the Military Records Unit at USIS, responsible for much of the security and investigatory work USIS performed under its existing contracts with OPM.

---

[1]  The Complaint alleged the following:  Count I - Breach of Contact against Callihan; Count II - Breach of Contact against Baucom; Count III - Breach of Contact against Vernick; Count IV - Misappropriation of Trade Secrets against all three defendants;  Count V - Unfair Competition against all three defendants; Count VI - Breach of Fiduciary Duty of Loyalty against all three defendants;  Count VII - Conversion against all three defendants;  and Count VIII - Civil Conspiracy against all three defendants.

Baucom was an Operations Manager for USIS and was responsible for managing several aspects of USIS' work with OPM, including managing the Military Records Unit.  In that capacity, she served as the supervisor for Callihan.

A.      USIS Confidentiality Agreements With Callihan and Baucom

On September 6, 2001, Callihan signed, in connection with her employment with USIS, a Confidentiality, Non-Compete and Non-Solicitation Agreement ("Confidentiality Agreement"), which provides, in pertinent part, as follows:

> "Proprietary Information" means the Company's trade secrets, customer lists, government data base information used or gathered by the Company for its customers, information provided to the Company by its Customers, and any and all information related to the Company's business operations or employees. (emphasis added.)

Callihan Confidentiality Agreement, at ¶ 1.b.

> Employee recognizes and acknowledges that because of his or her duties and position of trust as an employee of the Company, he or she will obtain Proprietary Information.  Employee agrees that he or she will not, during his or her employment with the Company or at any time thereafter, either directly or indirectly, disclose or use, without the prior written consent of the Company, any Proprietary Information; and that upon termination of his or her employment with Company promptly deliver to the Company all original and any copies of Proprietary Information.

Callihan Confidentiality Agreement, at ¶ 2 (emphasis added).

> Employee agrees that during his or her term of employment and for a six (6) month period commencing on the last day of Employee's employment with Company, whether terminated for cause or otherwise, he or she may not without the Company's written consent, directly or indirectly . . .
>
> > e.  disrupt or interfere or attempt to disrupt or interfere with any existing business relationship between the Company and its Customers.

Callihan Confidentiality Agreement, at ¶ 3.

Baucom executed multiple Confidentiality Agreements throughout her career with USIS: on July 29, 2003; August 10, 2003; October 8, 2004; and June 27, 2006.  Baucom's June 27,

3

2006 Confidentiality Agreement provides, in pertinent part, as follows:

> "Proprietary Information" means the Company's trade secrets, customer lists, government data base information used to gather data for Company customers, <u>and any and all information related to the Company's business operations or employees</u>.  (emphasis added.)

Baucom Confidentiality Agreement, at ¶ 1.b.

> "Confidential Information" means any and all knowledge, information, data, methods or plans, which are now or any time in the future developed, used or employed by Company, <u>which are treated as confidential by Company and not generally disclosed to the public and which relate to the business operations or financial affairs of Company</u>, including, but not limited to, financial statements and information, marketing strategies, business development plans and product or process enhancement plans.  (emphasis added.)

Baucom Confidentiality Agreement, at ¶ 1.d.[2]

> Employee recognizes and acknowledges that because of his or her duties and position of trust under this Agreement, he or she will obtain Proprietary and Confidential Information.  Employee agrees that he or she will not, during or at any time after the term of this Agreement, either directly or indirectly, disclose or use, without prior written consent of the Company, any Proprietary or Confidential Information; <u>and that upon termination of his or her employee with Company to promptly deliver to Company all original and any copies  of the Company's Proprietary and Confidential Information</u>.

Baucom Confidentiality Agreement, at ¶ 2 (emphasis added).

> Employee states that during his or her term of employment and for a one (1)  year period commencing on the last day of Employee's employment with Company, whether terminated for cause or otherwise, he or she may not without Company permission, directly or indirectly . . .
>
>> b.  divert, disrupt, interfere with, disturb or take away, or attempt to divert, disrupt or interfere with, disturb or take away any existing business relationship between Company and any of its customers.

Baucom Confidentiality Agreement, at ¶ 3.b.

---

[2]  In contrast，Callihan's Confidentiality Agreement does not define "Confidential Information."

B.    USIS' Contracts with OPM

Prior to 2011, USIS performed the majority of its work for OPM under a Background Investigations Support Services Contract (the "2006 Support Services Contract"), which was awarded by OPM to USIS in 2006.  The 2006 Support Services Contract between USIS and OPM was scheduled to expire on June 30, 2011 and, as a result, OPM decided in November 2010 to "rebid" the work.

The services to be provided under the new 2011 Support Services Contract, however, were different than the services provided under the original 2006 Support Services Contract.  For example, the 2006 Support Services Contract included a consolidated leads function, which pertained to the military records component of the contract.[3]  However, OPM determined that the consolidated leads function work would now be provided under a separate contract (hereinafter referred to as the "Consolidated Leads Contract") and thus, sought separate proposals for the consolidated leads function and limited the range of potential prime contractors to include only qualifying small businesses.

Given the small business requirement, USIS decided not to bid for the Consolidated Leads Contract.  In November 2010, USIS conducted Town Hall Meetings at the Roadhouse Cafeteria during which Michael Santelli ("Santelli"), USIS President of Information Management, informed USIS employees that USIS would not be pursuing the Consolidated Leads Contract.   During his deposition, Santelli explained that the purpose of the meetings was to explain to USIS employees that they would no longer have functions in the military records division, but that USIS would help them in finding employment.  USIS told its employees

---

[3]  The consolidated leads function involved, *inter alia*, obtaining and reviewing military records, immigration records, vital statistics and similar information concerning persons who are the subjects of background investigations.

5

involved with military records that it would either (1) facilitate access to other employers or (2) work with employees who wanted to stay with USIS.

Santelli testified that shortly after conducting the Town Hall Meetings, USIS learned that a small business could partner with a larger company for the purpose of bidding on the Consolidated Leads Contract.[4]  The small business would be the prime contractor, with the option to contract with a larger company, as a subcontractor.  In early December, USIS was contacted by Jupiter to discuss a possible teaming arrangement to bid on the Consolidated Leads Contract.  Santelli declined Jupiter's request and informed Jupiter that USIS was not going to pursue the contract.  However, on or about December 21, 2010, USIS agreed to team with NT Concepts Corporation ("NT Concepts"), which would serve as the qualifying small business contractor.

USIS advised Baucom on December 21, 2010 that it would be jointly submitting a proposal for the Consolidated Leads Contract as a subcontractor to NT Concepts.  Accordingly, as of December 2010, USIS was attempting to secure two OPM contracts:  the "rebid" 2011 Support Services Contract directly and the Consolidated Leads Contract indirectly as a subcontractor to NT Concepts.

USIS and NT Concepts worked together to submit a detailed and comprehensive proposal for the Consolidated Leads Contract, which proposal was submitted to OPM on February 3, 2011.  Baucom was heavily involved in the preparation of USIS' confidential proposals for both the 2011 Support Services Contract and the Consolidated Leads Contract.  In fact, Baucom

---

[4]  Santelli testified that USIS did not learn until December 2010 that a small business could partner with a larger company for the purpose of bidding on the Consolidated Leads Contract. Defendants attempt to rebut Santelli's testimony by arguing that the OPM Request for  Proposal ("RFP") indicates the ability for the small business prime contractor to partner with a subcontractor which could be either a large or small business.  Neither Defendant provided a copy of the RFP to the Court; hence, their argument is unsubstantiated.

worked on the USIS 2011 Support Services Contract proposal up until November 2010 and

worked on the USIS Consolidated Leads Contract proposal until the time she left USIS on

January 24, 2011.

 

      C.      <u>The Jupiter /KeyPoint Relationship and the Jupiter Job Fair</u>

As stated *supra*, Jupiter and KeyPoint are competitors of USIS.  For the purpose of

bidding on the Consolidated Leads Contract, Jupiter was to team with KeyPoint.  Jupiter was the

designated small business enterprise and KeyPoint was to serve as the subcontractor to Jupiter.

Like USIS, KeyPoint was also directly bidding on OPM's 2011 Support Services

Contract.

On or about December 14, 2010, Jupiter held an Open House / Job Fair, the purpose of

which was to interview and recruit potential employees to assist in bidding on the Consolidated

Leads Contract and performing work on the contract in the event Jupiter and KeyPoint were the

successful bidders.  Callihan and Sharon Vernick[5] attended the job fair.

On December 16, 2010, Callihan, Vernick, and Baucom met at a restaurant in Butler,

Pennsylvania to discuss possible employment opportunities with Jupiter and each completed a

Jupiter employment application.  Baucom and Callihan gave their Jupiter employment

applications to Vernick to fax to Jupiter's owners, Clyde and Pat Jupiter, which she did the next

day, December 17, 2010.

Callihan testified in her deposition that she was looking for another job because, "I was

looking for a promotional move.  I also knew that at that time, I believe, that USIS was not going

---

[5]  Sharon Vernick had formerly worked with Baucom and Callihan at USIS when all three held
the job title of "Team Leader."  In October 2007, Vernick transferred to USIS' marketing
department and relocated to its Grove City, Pennsylvania office.  The three remained friends
after Vernick's transfer.  Vernick resigned from USIS in January 2011.

to be bidding on that contract, and I knew that portion of the contract [the Consolidated Leads Contract] would be going, that there would be other companies bidding on it."  App. Ex. 2, Callihan Depo. at 47.  Callihan further testified that she was not informed of USIS's decision to bid on the Consolidated Leads Contract until January 5, 2011, after she had already accepted a position with Jupiter.

Baucom testified in her deposition that she initially pursued employment with Jupiter because she did not consider Jupiter a competitor of USIS based on the decision of USIS not to bid on the Consolidated Leads Contract.

D.      Employment with Jupiter and KeyPoint

While still employed by USIS, Vernick, Baucom, and Callihan negotiated the terms of their employment with Clyde Jupiter, CEO of Jupiter, and his wife, Pat.  One of the terms of employment sought by the three women was indemnification against any claims that might be advanced against them by USIS in the future.  Jupiter agreed to the indemnification language and agreed to defend Vernick, Callihan, and Baucom in connection with any litigation initiated by USIS.

On December 20, 2010, Jupiter, through its Human Resources Director, Wynette Fouche-Gibson, emailed a contingent offer letter to Baucom for employment with Jupiter.  By email dated December 20, 2010, Baucom responded as follows:  "We are still awaiting some advice from legal counsel Sharon [Vernick] has been speaking to in regards to proprietary information and also my role as holding a key personnel [position] on the Support Services' effort for USIS . . . ."  App. Ex. 58 (emphasis added).

8

On December 22, 2010, Baucom sent the following email to Clyde Jupiter, Pat Jupiter, and Wynette Fouche-Gibson:

> I wanted to let you know that due to a new project I have (sic) placed on with my current organization I feel as though it would be a conflict of interest to continue to pursue a position with Jupiter for the Consolidated Leads contract. I just learned of this yesterday late afternoon and took the evening to try and weigh everything and ensure I was making the best decision for both organizations. I very much appreciate your offer of a role within your organization and do truly believe that I would have enjoyed working for you and in the contract. I am currently at work is the reason I am not doing this via telephone but would gladly take some time later today to discuss over the phone if anyone would prefer further explanation. Again I apologize for the means of communication but wanted to get the information on my decision as soon as possible and do very much appreciate the opportunities that were offered to me this past week. Best regards in your endeavors in pursuing the OPM business.
>
> Thanks,
> LeeAnn Baucom

App. Ex. 58.

Baucom testified in her deposition that the "new project" she referred to in her email was the Consolidated Leads Contract that OPM was putting out for bids. On December 21, 2010, Baucom had been informed by her supervisor, Tracy Grasha, that USIS had decided to submit a proposal with NT Concepts for the Consolidated Leads Contract.

In her capacity as Operations Manager, Baucom was heavily involved in the preparation of USIS' confidential proposals for both the 2011 Support Services Contract and the Consolidated Leads Contract. In fact, Baucom had worked on the USIS 2011 Support Services Contract proposal up until November 2010 and worked on the Consolidated Leads Contract from December 22, 2010 until the time she left USIS on January 24, 2011.

Callihan received an initial contingent letter of employment from Jupiter on December 23, 2010, which contained the following indemnification language:

> In the event that you experience litigation from your present employer on the basis of any non-compete agreement you may have executed, *JUPITER* commits to defend you as our employee in any resulting litigation.

App. Ex. 9.  Callihan signed the offer letter on December 28, 2010.  The indemnification language in Callihan's offer letter was not as strong or comprehensive as the language Jupiter inserted into Vernick's offer letter.  Therefore, on December 30, 2010, Vernick sent an email to Jupiter in which she asked if it "[w]ould be possible to send the same letter to Susan [Callihan] to re-sign.  It looks like she and I will be the only two joining at this time . . . no worries though! We may be even more competitive in our price this way. . . ."  App. Ex. 11.

On December 30, 2010, Callihan received a revised contingent offer letter from Jupiter, which provided, in pertinent part, as follows:

> In the event that you experience litigation from your present employer on the basis of any non-compete agreement you may have executed, *JUPITER* commits to defend you as our employee in any resulting litigation, to include all fees and/or costs associated with the litigation process, which shall also be inclusive of any and all settlements or awards granted by the court to the plaintiff.

App. Ex. 12.  Callihan signed the revised contingent offer letter on December 30, 2010.

According to Callihan, she learned on January 5, 2011, that USIS was going to partner with NT Concepts for the purpose of bidding on the Consolidated Leads Contract.  That day, during her break at USIS, Callihan called Vernick and expressed that "she had concerns and indicated that she might back out of the agreement that she had already made with Jupiter." App. Ex. 49.  Later that day, there was a conference call between Callihan and Jupiter to discuss

both her resume and the Consolidated Leads Contract Request for Proposal ("RFP").  App. Ex. 49.  During the conference call, Callihan responded to inquiries regarding the RFP.

In response to Callihan's concerns that her employment with Jupiter was a direct conflict of interest with USIS, on January 5, 2011, Clyde Jupiter sent an email to Callihan in which he stated that KeyPoint has "agreed to consider your immediate application for work with them on an existing contract. . . . We are still bidding you in the same position as a JUPITER employee on the Consolidated Leads project; we will deal with your transfer to JUPITER following our win of the bid."  App. Ex. 14.

On January 6, 2011, Callihan spoke with Jupiter and again expressed her concern that, if she were to assist Jupiter and KeyPoint in obtaining the Consolidated Leads Contract, she would be breaching her duty to USIS and operating under a direct conflict of interest.  Jupiter, in response, coordinated with KeyPoint and made arrangements to have KeyPoint offer Callihan a job, purportedly as a "full time case reviewer," which was a position that Callihan testified she understood to be unrelated to the preparation of the Jupiter / KeyPoint Consolidated Leads Contract proposal.[6]  That evening, at Callihan's home, Baucom assisted Callihan with the preparation of Callihan's resume, which she was to submit to KeyPoint.

Callihan signed her offer letter from KeyPoint on January 10, 2011.  The offer letter specifically stated that it was

> understood by both parties that should Jupiter Corporation win the
> bid with OPM for the Consolidated Leads effort that Ms. Callihan
> will resign to accept a job with Jupiter.  However, this job is not
> conditional upon the selection of Jupiter as the awardee for the bid.
> Should Jupiter not be selected for award on the bid, Ms. Callahan

---

[6]  Despite her understanding of the responsibilities of a "case reviewer," Callihan testified that Jupiter and KeyPoint repeatedly requested from her confidential USIS information related to the Consolidated Leads Contract.

11

> may continue in the job of reviewer for KeyPoint subject to
> acceptable performance and the normal terms of employment.

App. Ex. 23.    Callihan's expected start date with KeyPoint was January 24, 2011.

E.      Resignations of Callihan and Baucom

On January 7, 2011, Callihan submitted her written resignation to USIS, in which she stated that "I have been given some new opportunities and now have the ability to no longer have to be employed on a full time basis."  App. Ex. 25.  Callihan did not disclose that she was going to be employed by KeyPoint.  Baucom, as Callihan's supervisor, prepared a USIS employee separation form for Callihan.  The form prepared by Baucom stated that Callihan was resigning for "Family Reasons" - "Susan has resigned her position with USIS due to family reasons to stay home."  App. Ex. 59.

Tracy Grasha ("Grasha"), who was the Senior Operations Manager for USIS and the person to whom both Baucom and Callihan reported, found Callihan's resignation to be suspicious insofar as Callihan had previously expressed an interest in advancing her career, in pursuing a management position, and in working with USIS on the Consolidated Leads Contract. Given her suspicions, Grasha asked Baucom, as Callihan's direct supervisor, to "find out about" the reasons for the resignation and to confirm that Callihan was not taking a position with a competitor.  Baucom falsely reported back to Grasha that Callihan was not taking a position with another company, but rather "was staying home with her family, and to spend more time with her girls and her horses and things of that nature."  App. Ex. 74, Grasha Depo. at 82.

Callihan's last day of employment with USIS was January 21, 2011.  During the two-week period prior to her termination, Callihan trained her replacement, Jennifer Kienzel.

12

During a January 22, 2010, conversation with Vernick, Baucom indicated that she was reconsidering her decision to withdraw from Jupiter and inquired as to whether Jupiter still had open positions.  Baucom submitted her letter of resignation on January 24, 2011.   She did not advise USIS that she was leaving to join Jupiter.  Rather, Baucom stated, "Unfortunately, there are family needs and personal health reasons which have lead me to this decision to step down at this time in order to resolve them."  App. Ex. 60.  Upon receiving her resignation, Jennifer Mehall ("Mehall"), Baucom's supervisor, questioned  Baucom as to rumors that Baucom had been speaking to Jupiter and was taking a job with Jupiter.  Baucom denied having accepted employment with Jupiter and told Mehall that "[we]'re still working on finalizing the dates and things.  I did not have a full commitment though at that time to start."  App. Ex. 3, Depo. of Baucom at 120.[7]  Although Baucom expected her last day of work to be on or about February 4, 2011, out of concern that Baucom was in fact working with Jupiter to obtain available OPM work, Mehall asked Baucom to make January 24, 2011, her final day of employment.

Baucom packed approximately fifteen (15) boxes of "personal belongings," when she left the USIS premises on January 24, 2011.  One of the items she packed and took with her was an external storage device, i.e., a USB external thumb drive.


F.   Employment of Baucom and Callihan with Jupiter / KeyPoint

On January 25, 2011, Baucom called Clyde Jupiter to inform him that USIS had asked her to leave the previous day and that her employment contract with Jupiter Corporation could be

---

[7]  However, the summary judgment record reflects that Baucom signed the Jupiter offer letter on January 22, 2011, but post-dated it January 25, 2011, the day after Baucom submitted her letter of resignation to USIS.  In her deposition,  Baucom testified that her signature was dated January 25, 2011 at the request of Jupiter, which asked her "to date it the 25th of January," and to "contact them on the 25th once [her] resignation with USIS had become effective and [they] would execute the Jupiter offer at that point."  App. Ex. 3, Baucom Depo at 114-118.

executed.  Jupiter's offer of employment to Baucom was a permanent position as a Security

Management Analyst and was not contingent upon the award of the Consolidated Leads Contract

to Jupiter.  During that conversation, Clyde Jupiter offered to commit to a February 1, 2011 start

date, instead of the early March start date that was previously discussed.  It was during this

conversation that Clyde Jupiter requested Baucom's assistance with the review and editing of its

Consolidated Leads Contract proposal.  Baucom informed Clyde Jupiter that she had worked

extensively on the USIS Consolidated Leads Contract proposal prior to her leaving USIS and did

not want to do anything which would potentially violate any previous employment agreement

with USIS.  According to Baucom, Jupiter assured her that he did not see an issue and that

Baucom would be doing nothing to violate any non-solicitation and confidentiality agreement.

App. Ex. 3, Baucom Depo. at 153.  Thereafter, on that same day, Baucom provided edits to a

segment of the Technical Section of the Jupiter Consolidated Leads Contract proposal.

Baucom testified that various versions or drafts of the Jupiter / KeyPoint proposal were

emailed to her for "read over," "ensure internal consistency," and "edit," if needed.  According

to Baucom, she wrote versions of the Jupiter / KeyPoint Consolidated Leads Contract proposal

between January 25, 2011 and February 1, 2011, and that she circulated the drafts to Callihan,

Vernick, and Bill Newton of Jupiter.  Baucom also assisted Jupiter in filing the Consolidated

Leads Contract proposal to OPM by personally delivering it to an OPM representative.

After the Jupiter / KeyPoint Consolidated Leads Contract proposal and the separate

KeyPoint 2011 Support Services proposal were filed, Callihan and Baucom continued to work on

responding to follow-up questions from Jupiter.  In February 2011, Baucom prepared a chart

with the names of USIS employees who were on its military record unit staff.  The chart

contained the names of current USIS employees, their position with USIS, whether they would

14

be a good fit for Jupiter or KeyPoint, their current USIS office location, and comments by Baucom about the employee.

G.      USIS Investigates The Conduct of Baucom and Callihan

After the departure of Baucom and Callihan, USIS conducted an analysis of Defendants' USIS computers and hard drives.  USIS discovered that Callihan on January 21, 2011, emailed USIS documents to herself using her external email account.  These documents included, *inter alia*, the "ESI Guidelines," an OPM Military Operations Manual, which USIS alleges is a "highly confidential document,"[8] as well as certain Excel spreadsheets, which contained OPM case numbers, deadlines and other case-specific information, along with individual names and other personal identifying information for individuals currently subject to background investigations and/or security clearance investigations through USIS.  Callihan does not dispute downloading these documents and explains that she emailed the documents to herself so that she would have access to reference material if her replacement, Jennifer Kienzel, had any questions and needed help with her transition into the new job.  Callihan Depo. at 150; Callihan Affidavit, at ¶ 6 (Sealed Document No. 93-1).

The forensic review of Baucom's computer and hard drive determined that Baucom, prior to leaving USIS, downloaded numerous proprietary and highly confidential OPM proposal files to one or more portable USB storage devices.  The files downloaded included a Support Services Training Plan Document, and  actual portions of USIS' Support Service Contract proposal, as well as information pertaining to the Consolidated Leads Contract proposal.

---

[8]  USIS alleges that as a result of Callihan's conduct, USIS, through its Director of Security, was required to notify OPM of the breach of security which resulted from Callihan's unauthorized misappropriation of confidential information.

Another document downloaded by Baucom to her USB storage drive was a confidential and proprietary document entitled "Example QC Report.xls," which was on USIS letterhead. This document was downloaded on December 30, 2010.  Callihan testified that she obtained the document from Baucom and provided it to Bill Newton of Jupiter on January 9, 2011, in order to answer Newton's questions about USIS' internal practices and procedures.

Baucom does not dispute downloading these documents and in her deposition explained that the Support Services Training Plan Document was loaded in October 2010 for the following reason:

> I downloaded it, but it was for Hope Mays, another operation manager at USIS.
> She was having connectivity issues at Grove City, and we were working on the support services proposal in October, and she was instructed to have someone download the document to a thumbdrive for her so she could take it and upload it on her laptop and work from that, so I did download it, but it was downloaded for her.

App. Exh. 3, Baucom Depo. at 129.

Baucom further explained that she downloaded the Support Services proposal documents in December 2010 and January 2011 to "ensure that NT Concepts had made changes to the USIS provided documents and had only used the documents as a template and were not copied verbatim."  Br. at 5.  Further, Baucom testified that she downloaded the information to her personal USB storage drive so she could work from home.

Baucom also contends that it was during the "expedited packing of belongings" on her last day of employment that the personal thumb drive was "innocently packed away in a box without thought of the information which may be contained in the drive."  Br. at 6-7.  Baucom testified that on March 6 or 7, 2011, while she was searching through the boxes that she had packed upon leaving USIS, she discovered that the personal thumb drive was in her possession.

According to Baucom, upon discovering the thumb drive, she inserted it into her personal laptop, searched the contents and saw that it contained, *inter alia*,

> key personnel resumes, and I realized at that point that I had information that I should not have in my possession.  I guess I didn't think things through as I should have, but I felt that my best course of action was to actually destroy the thumb drive and, therefore, there would be no possible way that that information would be able to be regained, so I smashed it and actually burned it in my father's coal furnace.

App. Ex. 3, Baucom Depo at 135.[9]

On March 18, 2011, USIS filed the instant lawsuit.  On March 23, 2011, Callihan was terminated from KeyPoint for "improperly downloaded documents to her personal e-mail address while employed by USIS."   The next day,  Jupiter's HR Director sent an email to Baucom in which she was notified that her employment was terminated:

> Effective immediately, your employment with JUPITER is terminated.
>
> You should retain an attorney to represent you with regard to the law suit that USIS filed against you.  JUPITER will not be engaging an attorney on your behalf.

App. Ex. 68.

Not long after Callihan and Baucom were terminated, Jupiter and KeyPoint withdrew their respective bids for the two OPM contracts.  Thereafter, USIS was awarded the Support Services Contract, as well as the Consolidated Leads Contract as a subcontractor with NT Concepts.

---

[9]  USIS contends that at the time Baucom destroyed the USB thumb drive, she was fully aware that there was a possibility that USIS would initiate litigation against her for breach of her USIS Confidentiality Agreements.  In fact, Baucom had received a letter from USIS which outlined her alleged misconduct and threatened legal action against her.

H.      Discovery Reveals Additional Disclosures by Callihan and Baucom

At the time the instant lawsuit was filed, USIS was aware only that on her last day of

employment Callihan had emailed to her external e-mail account several USIS documents and

that Baucom had downloaded several documents onto a portable USB storage device.   However,

through discovery, which included the forensic examinations of both Defendants' hard drives

and review of documents subpoenaed from Jupiter and KeyPoint, USIS  discovered that Callihan

and Baucom had allegedly disclosed information far beyond the information known to USIS at

the time the Amended Complaint was filed.

1.  Discovery Reveals Additional Involvement by Callihan with Jupiter and
    KeyPoint

·       On January 7, 2011, Bill Newton, a Senior Technical and Management
Consultant for Jupiter, sent an email to Callihan and Vernick asking seventeen
(17) questions which pertained to the Quality Control section of the Consolidated
Leads Contract.  Newton supplemented the questions with two (2) additional
questions via email on January 8, 2011.

·       On January 8, 2011, Callihan sent Jupiter via email the names and phone
numbers of two USIS employees who she identified as employees who would be
"assets" to Jupiter.

·       On January 8, 2011, Callihan and Vernick participated in a conference call
with Clyde Jupiter and Linda Dei and Scott Kobasick of KeyPoint, to discuss the
Consolidated Leads Contract proposal.

·       On January 9, 2011, Callihan sent an email to Jupiter and KeyPoint in
response to Newton's questions which requested information on USIS's practices,
procedures, and information.  In her email, Callihan stated:

                I tried to put some things together for you in regard to the
        below questions; look them over and send me anything additional
        or information that might need to be clarified.  Some of the

18

information I was not real confident about, but I will try to get some additional information as I can without raising red flags.

Thanks.

Susan

App. Ex. 38.

·      On January 10 and 11, 2011, Linda Dei of KeyPoint emailed Callihan and Vernick asking questions and seeking information in connection with the Consolidated Leads Contract proposal.  Vernick responded to Linda Dei by email, and copied Callihan on her response, which stated in pertinent part, as follows:

Hi Linda:

Thanks for the questions . . . .  This is a crucial part of the RFP response.  Our original estimate for the total FTE was between 45-50.  **I received insider information yesterday that the USIS team will be pitching [redacted] FTE, which is definitely too few.  They appear to be trying to angle this from a minimum cost perspective, but this does not seem to be well thought through**.   I understand the Jupiter team does not base its numbers/response on what the competition is doing, but it is always helpful to have an insider's view.

Susan and I will discuss these questions and then communicate our findings on the case this evening.

Kind regards.

Sharon

App. Ex. 32 (emphasis added).

·      On January 12, 2011, Vernick sent another email to Linda Dei entitled "Re:  Follow-Up to Questions on INS CHECKS," on which she copied Callihan, and provided the answers to Linda Dei's questions and stated that "we are still determining when the best time to have a call today might be . . . ."

·      On January 12, 2001, Linda Dei provided a revised manpower estimate to be used for the Consolidated Leads Contract.  The information was shared with Jupiter and KeyPoint representatives, as well as Vernick and Callihan.  In her email, Linda Dei stated:  "These were (sic) using the man-minutes provided by Sharon. . . ."

19

·       On January 12, 2011, Vernick provided to Bill Newton of Jupiter, via email on which Callihan was copied, specific USIS practices and procedures and information concerning the USIS Quality Control Department and its employees.

·       On January 12, 2011, Callihan emailed Clyde Jupiter information which detailed USIS staff practices and utilization of USIS staff with regard to INS checks.

·       On January 13, 2011, Bill Newton emailed Vernick and Callihan inquiring as to what audit results are reported in the monthly QC report.

·       On January 17, 2011, Bill Newton sent another email to Callihan stating: "Susan, Now that you are a KeyPoint employee, will you have time during the work day to consult with us on the proposal?"  Callihan responded:

> I will do my best to be available however I am still technically a USIS employee until Friday.  I also have a very busy week this week.  I am working to look over the documents[10] you sent me however, I will not be able to get it back to you by COB tomorrow. . . I am looking at best to have this to you by COB on Wednesday

App. Ex. 39.

·       On January 19, 2011, Scott Kobasick with KeyPoint emailed Vernick and Callihan asking questions about quality control procedures.  The next day, Vernick provides answers to Kobasick's questions via email with a copy to Callihan.  Vernick's email specifically addresses the use by USIS of a tracking / assignment data base called "Blue Zone."

App. Ex. 40.

2.   <u>Discovery Reveals Additional Involvement by Baucom with Jupiter and KeyPoint</u>

Baucom contends that she had no contact with any representatives of Jupiter from

December 22, 2011, to January 22, 2011.  However, the summary judgment record evidence

reflects that on January 19, 2011, Vernick forwarded to Baucom two email chains in which the

---

[10]  The documents referred to by Callihan are documents relating to Jupiter's Consolidated Leads Contract proposal that she was reviewing.

Jupiter / KeyPoint Consolidated Leads Contract proposal was discussed.  *See* App. Exhs. 72 and 73.

USIS has also submitted the Declaration of Christy Bartoe, a USIS employee, in which Bartoe states that on January 8, 2011, Baucom told her that "she, Callihan and Vernick have been working with Jupiter with regard to making a proposal for the Consolidated Leads Contract to OPM and that the three of them were going to work with Jupiter . . ."  App. Ex. 76. Additionally, Bartoe states that she met with Baucom on January 24, 2011, after Baucom had been asked to leave, and Baucom told her that "now that USIS cut her loose, she was going full force on Jupiter's Consolidated Leads Contract proposal."  *Id.*

Bartoe also stated in her Declaration that, based on conversations with Callihan, most if not all, telephone conversations between Callihan, Baucom, and Jupiter occurred within USIS offices and that these calls included discussions which related to the Consolidated Leads Contract.

Baucom conceded in her deposition that she had various versions or drafts of the Jupiter proposal emailed to her for review and that she provided edits to "a small segment" of the Technical Section of the Jupiter Consolidated Leads Contract proposal.  However, according to Baucom, the edits she provided were based entirely upon information made available to the public in the OPM Reading Room.  Baucom denies that the provisions written in the USIS / NT Concepts proposal and the Jupiter/KeyPoint proposal contained within the Technical Sections are identical, but does concede that the provisions are  "similar."

### STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

> [Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In interpreting Rule 56(c), the United States Supreme Court has stated:

> The plain language . . . mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant.  Celotex, 477 U.S. at 323.  The "existence of disputed issued of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party."  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (quoting Pittsburgh gage & Supply Co., 464 F.2d 870, 874 (3d Cir. 1972)).  Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence.  *Josey v. John R. Hollingsworth Corp*., 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co*., 998 F.2d 1224 (3d Cir. 1993).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' - - that is, point out to the District Court - - that there is

an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325.  If

the moving party has carried this burden, the burden shifts to the non-moving party, who cannot

rest on the allegations of the pleadings and must "do more than simply show that there is some

metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*.,

475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230.  When the non-

moving party's evidence in opposition to a properly supported motion for summary judgment is

"merely colorable" or "not significantly probative," the court may grant summary judgment.

*Anderson,* 477 U.S. at 249-250.


## LEGAL ANALYSIS

USIS seeks summary judgment on Defendants' liability only as to Count I - Breach of

Contract (Callihan), Count II - Breach of Contract (Baucom) and Count V - Breach of Fiduciary

Duty (Callihan and Baucom).  In response, neither Callihan nor Baucom dispute that they

disclosed information to Jupiter and KeyPoint, competitors of USIS,  or that they both owed a

fiduciary duty of loyalty to their employer, USIS.  Rather, Defendants argue that the disclosed

information is not "proprietary or confidential."

Additionally, Callihan also presents a rather novel argument - that USIS should be

limited solely to the specific facts pleaded in its Amended Complaint - i.e., the January 21, 2011

email to her personal account.  Callihan argues that "[b]ased on the USIS' Motion for Partial

Summary Judgment and its Memorandum it is evident that it has decided to abandon the original

claim and instead focus on something entirely new and entirely different."  Callihan Br. at 19.

This argument can be rejected rather summarily.

The plain language of the Amended Complaint states, in pertinent part, as follows:

> [T]he claims asserted against Callihan are premised entirely upon the actual evidence of misappropriation of USIS information.

Amended Complaint, Paragraph 62.

Further, Paragraph 93 specifically states:

> By virtue of the conduct described above, and in the Declarations filed herewith, <u>and other wrongful conduct which will be disclosed through discovery in this action</u>, Defendants have misappropriated the proprietary information of USIS and have usurped corporate opportunities from USIS for their own personal gain.

Amended Complaint, Paragraph 93 (emphasis added).

At the time the Amended Complaint was filed, USIS was aware only that Callihan had emailed herself USIS documents on January 21, 2011; however, discovery revealed that Callihan had communicated with Jupiter and KeyPoint in a multitude of ways not known to USIS at the time the Amended Complaint was filed.  The Court finds and rules that USIS' claims and legal theories have never changed, *to wit*, USIS has always maintained that Defendants breached the terms of their Confidentiality Agreements with USIS and that Defendants breached their fiduciary duties to USIS.  Accordingly, Callihan's argument that USIS has abandoned its original claim is denied as wholly without merit.

A.   <u>Count I and II - Breach of Contract Claims</u>[11]

To state a claim for breach of contract under Pennsylvania law, a plaintiff must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir.

---

[11]  As stated *supra*, the contracts at issue are the respective Confidentiality Agreements executed by Callihan and Baucom.

2003).  It is settled that, under Pennsylvania law, an employee's duty not to use or disclose his employer's confidential information or trade secrets may arise from a contact.  *Air Products & Chemicals v. Johnson*, 442 A.2d 1114, 1120 (Pa. Super. Ct. 1982).

In this case, there is no dispute that both Callihan and Baucom are subject to the terms of their respective Confidentiality Agreements with USIS.   Both Defendants were required to maintain the confidentiality of USIS' proprietary information, which information includes the details of USIS' government solicitations and the nature of the technical services performed by USIS for OPM.

While Defendants do not dispute that they took and/or disclosed USIS information, they both argue that the USIS information was not proprietary or confidential as the information taken and/or disclosed does not constitute "trade secrets."  The Court finds this argument to be without merit.   USIS has not filed summary judgment on its claim for trade secret misappropriation. Accordingly, it is not USIS' burden at this time to establish that the information taken and/or disclosed by Defendants constituted trade secrets.   Rather, it is the burden of USIS to establish that the information taken and/or disclosed was proprietary and confidential, as those terms are defined in the USIS Confidentiality Agreements executed by Defendants.   Both agreements clearly provide that "proprietary information" includes "any and all information related to the Company's business operations or employees."   Callihan Confidential Agreement, App. Ex. 7. *See also* Baucom Confidential Agreement, App. Ex. 50.[12]

---

[12]  The wording of Baucom's Confidentiality Agreement is slightly different in that it uses the phrase "Company's business operations <u>and</u> employees" rather than "Company's business operations <u>or</u> employees" as used in Callihan's Confidentiality Agreement.

The summary judgment record evidence demonstrates that the information admittedly taken and/or disclosed by Defendants falls squarely within this definition. [13]  Therefore, the Court finds that the record evidence establishes that both Callihan and Baucom misappropriated, divulged, and/or used USIS' confidential, proprietary, and highly sensitive business information and did so at the repeated requests of Jupiter and KeyPoint.

Additionally, Baucom admits that she destroyed her USB storage drive which contained USIS confidential and proprietary information, rather than "promptly deliver[ing] to [USIS] all original and any copies of the Company's Proprietary and Confidential Information," as specifically required by Paragraph 2 of her Confidentiality Agreement.

The Court finds that the summary judgment record clearly demonstrates that both Callihan and Baucom breached their respective Confidentiality Agreements.  Accordingly, USIS is entitled to summary judgment as a matter of law in its favor as to Defendants' liability under Counts I and II of the Amended Complaint.

B.     Count V - Breach of Fiduciary Duty of Loyalty[14]

To state a claim for breach of fiduciary duty under Pennsylvania law, a plaintiff must first establish that a fiduciary relationship existed between the parties.  *See Basile v. H&R Block, Inc.*, 761 A.2d 115, 1119-1122 (Pa. 2000).  Further, a plaintiff must show that the defendant negligently or intentionally failed to act in good faith or solely for the benefit of the plaintiff in

---

[13]  The Court notes that in her Brief in Opposition, Defendant Callihan focuses exclusively on the information she emailed to herself on January 21, 2011.  She does not refer to the emails between Callihan and Jupiter and/or KeyPoint representatives which were uncovered during the discovery phase in this case.

[14]  Defendant Callihan did not separately address the claim of breach of fiduciary duty of loyalty. The Court will therefore, presume, that the arguments she made in rebuttal to the claim for breach of contract apply equally to this claim as well.

all manners for which the defendant was employed, that the plaintiff was injured as a result of this failure, and that the defendant's failure to act as a fiduciary was a real fact in bringing about the injury to the plaintiff. *Dinger v. Allfirst Financial, Inc.,* 82 Fed. Appx. 261, 265 (3d Cir. 2003).

In the present case, USIS alleges that both Defendants breached the fiduciary duty of loyalty each owes to USIS by "wrongfully using, exploiting and/or disclosing the confidential and proprietary business information of USIS without authorization" and that Defendants "have done so in an effort to provide an unfair advantage to Jupiter and KeyPoint in connection with the proposals submitted for the outstanding OPM contracts." Pl's Br. at 47.

Defendants do not dispute that a fiduciary relationship exists. However, Baucom argues that USIS has failed to demonstrate how Baucom breached her fiduciary duty of loyalty because (i) USIS has not demonstrated that Baucom disclosed "confidential or proprietary information" because there is no evidence in the record that any of the information Baucom alleged misappropriated comports with the definition of "trade secrets;" and (ii) USIS has not suffered any injury.

Baucom's first argument is rejected for the primary reason that USIS has <u>not</u> filed summary judgment on its claim for trade secret misappropriation. Rather, USIS alleges that the information improperly disclosed by both Defendants was proprietary and confidential, as those terms are defined in their Confidentiality Agreements with USIS.

As to Baucom's second argument, that USIS has suffered no damages, it is important to note that USIS is seeking only a determination as to liability at this time, "as the exact amount of damages suffered by USIS remains to be calculated. Among other categories of damages, USIS has been forced to incur the cost and expense of diagnosing, monitoring and protecting against

27

the security breaches committed by Defendants (including the considerable cost of a third-party

forensic analysis of Defendants' computers and e-mail) as well as the costs incurred in

connection with obtaining injunctive relief." Pl's Br. at 45, n. 17.  Additionally, USIS alleges

that as a direct and proximate result of Defendants' breach of fiduciary duties, USIS has suffered

and will continue to suffer "immediate and irreparable harm and injury, including, but not

limited to, potential loss of income and revenue, loss of clients, loss of trade secrets, loss of

confidential information, and loss of competitive advantages."

After a careful and deliberate review of the summary judgment evidence, the Court finds

that the undisputed conduct of Callihan and Baucom constitutes a clear violation of the fiduciary

duty of loyalty imposed under Pennsylvania law. Accordingly, USIS is entitled to summary

judgment as a matter of law in its favor as to Defendants' liability under Count V of the

Amended Complaint.


C.    Permanent Injunctive Relief

On March 30, 2011, the Court entered a Preliminary Injunction, by stipulation of the

parties, which temporarily enjoins Defendants Callihan and Baucom, and all other persons and

entities acting in concert with them, from, *inter alia,* "using, disclosing and/or copying the

confidential or proprietary business information and trade secrets of Plaintiff USIS."  USIS now

moves the Court to convert the existing Preliminary Injunction into a Permanent Injunction.

"According to well-established principles of equity, a plaintiff seeking a permanent

injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must

demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such

as monetary damages, are inadequate to compensate for that injury; (3) that, considering the

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Monsanto Co. v. Geertson Seed Farms*, ⸺ U.S. ⸺, 130 S. Ct. 2743, 2756 (2010).[15]  The decision to grant or deny the motion lies within "the sound discretion of the district judge, who must balance all of these factors in making a decision." *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982).  Injunctive relief is an "extraordinary remedy" that should be "granted only in limited circumstances." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988).

The Court finds that a permanent injunction is merited here.  Based on the summary judgment record, the Court cannot find that there are genuine issues of material fact concerning irreparable harm to USIS caused by Defendants' dissemination of USIS' confidential documents and information, especially in light of the fact that such information was disclosed to two competitors of USIS.

Moreover, the three remaining factors that govern permanent injunction determinations weigh in favor of USIS.  First, because Jupiter and KeyPoint are competitors of USIS , other available remedies at law may not adequately compensate USIS for any injury and/or loss of potential business, as such injuries may be difficult to quantify.  Second, in considering the balance of hardships, the Court finds that a permanent injunction is warranted as Defendants will

---

[15]  These Supreme Court cases resolved a dispute in Third  Circuit case law with regard to whether evidence of irreparable harm is necessary for a court to grant a permanent injunction, making it clear that a showing of irreparable harm is required.  *Compare Chao v. Rothermel*, 327 F.3d 223, 228 (3d Cir. 2003) (stating that a permanent injunction may be granted "where the moving party has demonstrated that: (1) the exercise of jurisdiction is appropriate; (2) the moving party has actually succeeded on the merits of its claim; and (3) the 'balance of equities' favors granting injunctive relief"), *with  Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001) (stating that a court may grant a permanent injunction if it finds, inter alia, that "the moving party will be irreparably injured by denial of injunctive relief") (*citing ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1477 nn. 2-3 (3d Cir. 1996).

not suffer any hardship by returning the materials, while USIS stands to lose otherwise useful information and perhaps business to a competitor(s).  Third, permitting employees to retain confidential documents in breach of the express terms of a contract would directly contravene the strong public interest in maintaining employee-employer trust and confidentiality. Also, because USIS is entitled to retain confidential information related to business practices and the like from the public, no public interest will be disserved by requiring Defendants to return or otherwise destroy the USIS documents in their possession.

CONCLUSION

For the hereinabove stated reasons, the Motion for Partial Summary Judgment filed by USIS will be granted.   Summary judgment will be granted to USIS as to liability only on Counts I, II,  and V of the Amended Complaint.    Furthermore, the Preliminary Injunction Order of Court issued on March 30, 2011, is converted to a Permanent Injunction.

An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| US INVESTIGATIONS SERVICES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:11-cv-0355 |
| | ) | |
| SUSAN CALLIHAN AND SARAH LEEANN BAUCOM, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER OF COURT**

**AND NOW**, this 19th  day of April, 2012, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that the

MOTION FOR PARTIAL SUMMARY JUDGMENT filed by Plaintiff, US Investigations

Services, LLC is **GRANTED as to liability only.**

Furthermore, the Preliminary Injunction Order of Court issued on March 30, 2011, is

hereby converted forthwith to a Permanent Injunction.

A telephonic status conference is scheduled on  Thursday, April 26, 2012 at 9:30 AM  to

discuss with counsel any remaining claims and damages.   Counsel shall confer and, once all

parties are on the telephone line, shall call into Chambers at telephone number 412-208-7495.

BY THE COURT:


s/ Terrence F. McVerry
United States District Court Judge

cc:     Mark A. Willard, Esquire
Eckert, Seamans, Cherin & Mellott
Email: mwillard@eckertseamans.com

Audrey K. Kwak, Esquire
Eckert, Seamans, Cherin & Mellott
Email: akwak@eckertseamans.com

Robert V. Campedel, Esquire
Eckert, Seamans, Cherin & Mellott, LLC
Email: rcampedel@eckertseamans.com

Ryan J. Siciliano, Esquire
Eckert, Seamans, Cherin & Mellott
Email: rsiciliano@eckertseamans.com

Alexander H. Lindsay , Jr., Esquire
Lindsay, Jackson & Martin
Email: Michele@lindsaylawfirm.com

Robert Varsek, Esquire
Rosen, Rosen & Bloom
Email: robertvarsek@yahoo.com

Charles T. Rosen, Esquire
Rosen, Rosen, Bloom & Varsek
Email: rrb@csonline.net